IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

KAYLA WILLIAMS, *Appellant*,

*v.*

ARIZONA DEPARTMENT OF ECONOMIC SECURITY, an Agency,

and

LAMONT MORTUARY, INCORPORATED, *Appellees*.

No. 1 CA-UB 23-0369

FILED 05-22-2025

Appeal from the A.D.E.S. Appeals Board
No. U-1900373-001-B

**REVERSED AND REMANDED**

COUNSEL

Nossaman LLP, Phoenix
By Ashley M. Mahoney, William Ellis Bassoff
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Amber E. Pershon
*Counsel for Appellee Arizona Department of Economic Security*

_____

**OPINION**

Presiding Judge Michael S. Catlett delivered the opinion of the Court, in which Judge Jennifer M. Perkins and Vice Chief Judge Randall M. Howe joined.

_____

**C A T L E T T**, Judge:

**¶1**        After Lamont Mortuary ("the Mortuary") terminated Kayla Williams ("Williams") as an employee, she requested unemployment benefits.  Eventually, the Arizona Department of Economic Security ("the Department") denied that request, concluding Williams had been insubordinate.  We granted Williams' application for appeal and now address three issues.  One, whether Williams' petition for review to the appeals board ("the board") was sufficient for us to have jurisdiction.  Two, whether the Department has standing to defend its decision in our court when the prevailing party in the agency proceedings does not appear.  And three, whether Williams is disqualified from benefits for insubordination.  We conclude Williams' petition for review was sufficient, the Department lacks standing, and Williams is entitled to benefits.

**FACTS AND PROCEDURAL HISTORY**

**¶2**        Mr. and Ms. Lamont ("the Lamonts") own and operate the Mortuary.  Williams worked as its office manager for two years before being discharged.  The Lamonts hired Williams knowing she had no office experience.  They did not train Williams themselves; they left that to the outgoing office manager.

**¶3**        When Williams started, she was the only office employee other than the outgoing office manager.  The Lamonts provided little oversight, preferring to let Williams handle the office and daily decisions on her own.  During Williams' time with the Mortuary, her workload spiked.  At Williams' request, the Lamonts hired two part-time employees to help, but Williams remained overwhelmed.

**¶4**        After a year on the job, Williams told Ms. Lamont she enjoyed billing and wanted to do only that.  But Ms. Lamont decided she would do billing herself, so Williams could focus on other tasks.  In the end, though,

Williams was reluctant to give up billing; Ms. Lamont relented and let Williams continue with it.

¶5        Shortly before Williams' discharge, Ms. Lamont took a more active role in the office. And she did not like what she found. The Lamonts felt Williams was not working quickly enough, but Williams thought she was overloaded. The parties discussed the situation—that was not fruitful. Things boiled over when Ms. Lamont learned Williams had not processed billings for three months, resulting in a large backlog. She directed Williams to begin working on billing that day. So Williams worked overnight to reduce the backlog. Sometime later, Williams had completed six months' worth of billing but had not come completely current. The Mortuary discharged Williams soon after. It did not give Williams any written warnings or document its reasons for discharging her.

¶6        Williams sought unemployment benefits. A Department deputy determined the Mortuary had not discharged Williams for willful or negligent misconduct, so she was eligible for benefits. *See* A.R.S. § 23-773(B).

¶7        The Mortuary challenged the deputy's determination with an appeal tribunal ("the tribunal"), consisting of an administrative law judge, who held a hearing. *See* A.R.S. § 23-671(A). When the hearing began, the tribunal said the issue was whether Williams was discharged for insubordination. Mr. Lamont testified but mostly deferred to Ms. Lamont's upcoming testimony. For example, when asked why the Mortuary discharged Williams, he mostly deferred to Ms. Lamont but observed that Williams could not do the job and had a defiant attitude.

¶8        As for Ms. Lamont, she testified about discovering the delinquent billing, her direction to Williams to "get to it today," and her dissatisfaction with the progress made afterward. Ms. Lamont testified about "trying to get passwords" from Williams after she was discharged. Ms. Lamont also mentioned other performance issues she was unhappy about, including long lunches and mistreatment of other employees. But she admitted Lamont Mortuary did not give Williams written warnings because its "habit" was to discipline orally.

¶9        Williams testified the Lamonts said she was fired for not getting work done on time and using vulgar language. She admitted she was behind with billing but attributed that to her increased workload. The tribunal then asked about the billing-backlog discussion that occurred before her discharge:

TRIBUNAL: When they asked you to complete the billing that day, did you complete it that day?

WILLIAMS: I got half of it done, 6 months' worth.

TRIBUNAL: Okay and when did you have that one-half done, that day?

WILLIAMS: Yes.

TRIBUNAL: The employer states that it was 2 weeks, they checked after 2 weeks, and you only had half of it done, is that correct?

WILLIAMS: No, it wasn't 2 weeks.  It took me a day or two.

TRIBUNAL: So it wasn't completed that day, is that correct?

WILLIAMS: No.

No one clarified whether Williams' last response meant "no, that is not correct" or "no, it was not completed that day."

¶10　　　　Addressing passwords, Williams admitted setting up accounts in her name because she was responsible for billing.  But she "didn't know that the password thing was an issue, when [she] got fired, until afterwards [she] found out."  She denied that she delayed providing passwords; instead, "[a]s soon as [Ms. Lamont] asked . . . [Williams] got it fixed that day."

¶11　　　　The tribunal reversed the deputy's determination.  The tribunal relied on Ms. Lamont's testimony, finding it was "more credible because it was specific as to the final incident and the reason [Williams] was insubordinate."  The tribunal also found Ms. Lamont's testimony "was corroborated by another employee witness and [Williams] actually confirmed that she was insubordinate."  Because the tribunal found the Mortuary discharged Williams for insubordination, it denied benefits.

¶12　　　　Williams petitioned for review by the appeals board.  *See* A.R.S. § 23-672; Arizona Administrative Code ("A.A.C.") R6-3-1504(A). The board affirmed the tribunal, adopting its findings and conclusions.  The board also concluded Williams was insubordinate because she did not provide the Mortuary with passwords when requested.

¶13　　　　Williams applied to appeal to this court.  *See* A.R.S. § 41-1993(B).  We granted her application and appointed pro bono counsel.

4

Williams filed an opening brief.  The Mortuary neither appeared nor filed an answering brief.  But the Department did both, contending the board's decision was correct.  Williams filed a reply brief arguing not only that the board's decision was wrong, but also that the Department lacks standing and its answering brief violates the Gift Clause (Ariz. Const. art 9 § 7).  The Department moved to strike those arguments because they were new.  We deferred ruling on that motion and instead allowed the Department to file a sur-reply.

## DISCUSSION

## I.

¶14        Before addressing the merits, we resolve two jurisdictional issues.

## A.

¶15        In unemployment benefits appeals, our jurisdiction is circumscribed.  *See* A.R.S. § 41-1993(B).  Section 41-1993(B) says that "[a]n issue may not be raised on appeal that has not been raised in the petition for review before the appeals board," and we have said that provision limits our jurisdiction.  *See Dynometrics Inc. v. Ariz. Dep't of Econ. Sec.*, 257 Ariz. 283, 289 ¶ 23 (App. 2024) ("[T]his Court lacks jurisdiction to consider an issue . . . that was not raised in the petition for review to the Appeals Board.").  Although no one suggests Williams did not include all issues in her petition for review that she raises on appeal, we must confirm she did.  *See State v. Limon*, 229 Ariz. 22, 23 ¶ 3 (App. 2011) ("We have an independent duty to determine whether we have jurisdiction.").

¶16        Our supreme court has explained that, by limiting appellate review to issues raised in the petition for review filed with the appeals board, rather than issues the board later decides, § 41-1993(B) "implicates due process."  *Barriga v. Ariz. Dep't of Econ. Sec.*, 256 Ariz. 543, 550 ¶ 27 (2024).  Consider an employee who prevails in the tribunal in overcoming her employer's sole defense.  The employer then includes only that defense in its petition for review to the board.  In its decision, the board agrees with the employee on the defense the tribunal resolved.  But, on its own, the board relies on a different reason to deny benefits.  *See* A.R.S. § 23-672(C) (allowing the board to "affirm, reverse, modify or set aside the decision of the appeal tribunal or hearing officer").  Under § 41-1993(B), the employee could not appeal the board's adverse decision because the employer did not include the winning issue in the petition for review.  In that situation, the employee would lack notice that the different reason was at play and an

opportunity for judicial review—depriving them of due process. *See Solorzano v. Jensen*, 250 Ariz. 348, 350 ¶ 9 (App. 2020) ("[D]ue process entitles a party to notice and an opportunity to be heard."); *see also Gallarzo v. Ariz. Dep't of Econ. Sec.*, 245 Ariz. 318, 321 ¶ 9 (App. 2018) (concluding that "those who apply for an appeal under A.R.S. § 41-1993(B) have an interest that implicates due process").

¶17 In *Barriga*, our supreme court urged the legislature "to act to ensure that § 41-1993(B)'s scope of review does not run afoul of the fundamental requirements of due process." 256 Ariz. at 550 ¶ 27. The legislature has not done so. So, for now, we are left with three avenues. First, we can disregard § 41-1993(B) as unconstitutional. But doing so is the most drastic option available to avoid the due process problems, and one we disfavor. *See State ex rel. Brnovich v. City of Tucson*, 242 Ariz. 588, 597 ¶ 35 (2017) (we generally seek to avoid constitutional issues when interpreting and applying statutes). Second, we can narrowly interpret the board's authority to "modify" the tribunal's decision. *See* A.R.S. § 23-672(C). In other words, we can say that, although the board can sometimes modify a decision on appeal, it cannot do so based on an issue not raised in the petition for review. Or, third, we can take an expansive view of the term "issue" in § 41-1993(B) and charitably interpret petitions for review.

¶18 That third route is the narrowest available here. It avoids the constitutional issue and keeps the board's authority intact. And taking a broad view of the issues included in the petition for review is consistent with our preference for substance over form on procedural matters. *See Dynometrics*, 257 Ariz. at 289 ¶ 23 (taking a broad view of the petition for review); *Shea v. Maricopa County*, 255 Ariz. 116, 121 ¶ 20 (2023) (noting courts' "preference to 'look to substance rather than to form' when interpreting procedural devices"). So the third route is the one we take.

¶19 The statute does not define the term "issue." *See* A.R.S. § 41-1993(B). But when the legislature added that term to § 41-1993(B) in 1981[1], "issue" was commonly defined as "a matter that is in dispute between two or more parties[.]"[2] As Black's Law Dictionary explained, "an 'issue' is a disputed point or question to which parties to [an] action have narrowed their several allegations and upon which they are desirous of obtaining

---

[1]     *See* 1981 Ariz. Sess. Laws, ch. 65, § 2 (1st Reg. Sess.) (S.B. 1012).

[2]     *Issue*, Webster's Third New International Dictionary of the English Language (Unabridged) 1201 (1981); *Windhurst v. Ariz. Dep't of Corr.*, 256 Ariz. 186, 193 ¶ 19 (2023).

either [a] decision of [the] court on [a] question of law or of [a] court or jury on [a] question of fact." *Issue*, Black's Law Dictionary (5th ed. 1979).

**¶20**      When recounting the hearing testimony, the tribunal mentioned that Ms. Lamont said Williams "was defiant in providing . . . information, including passwords for accounts, to the owners." But the tribunal did not again mention passwords. In her *pro per* petition for review, Williams wrote, "I do not feel it is fair to have to pay unemployment money back" and mentioned nothing about passwords. But then the board found that Williams "failed immediately to give the [Mortuary] the passwords that [Williams] had established so that the [Mortuary] could access its billing program[,]" which the board thought was also insubordination.

**¶21**      Taking a narrow view of Williams' petition for review, one could argue she failed to mention the password issue, so we lack jurisdiction over it and must affirm on that ground. But that would hardly be fair—or consistent with due process—because the board first put the password issue front and center. *See Barriga*, 256 Ariz. at 543 ¶ 27. Instead, we conclude that Williams' petition—by saying she should not have to pay money back—adequately raised an "issue" about whether she had been insubordinate. In other words, insubordination was the "disputed point or question to which" the parties here had "narrowed their several allegations."[3] And because the password issue was embedded in the insubordination issue, Williams' petition sufficiently preserved the password issue for appeal, and we have jurisdiction.

### B.

**¶22**      Next, we address the Department's standing. The only party defending the tribunal's decision is the Department—the Mortuary has not appeared. Williams argues the Department "lacks standing to advocate for the substantive merits of its own decision in this case." The Department responds that § 41-1993(B), which says the Department "and all parties before the board shall be given . . . an opportunity to appear," gives the Department standing on all contested issues. In the Department's view, it has standing to defend all aspects of the board's decision even when the prevailing party does not do so. We review the Department's standing *de novo*. *Mills v. Ariz. Bd. of Tech. Registration*, 253 Ariz. 415, 420 ¶ 10 (2022).

---

[3]      *Issue*, Webster's Third New International Dictionary of the English Language (Unabridged) 1201 (1981).

**1.**

¶23  "[A] litigant seeking relief in the Arizona courts must first establish standing[.]" *Bennett v. Napolitano*, 206 Ariz. 520, 525 ¶ 19 (2003). To have standing to appeal a judgment, a party must be aggrieved by it. *See In re Gubser*, 126 Ariz. 303, 306 (1980). "For appellant to qualify as an aggrieved party, the judgment must operate to deny her some personal or property right or to impose a substantial burden upon her." *Id.*; *see also* A.R.S. § 41-1993(B) (stating that "[a]ny party aggrieved by a decision of the appeals board" may apply to appeal).

¶24  But even when aggrieved, a party "may nevertheless lack standing to assert particular arguments in attempting to secure a reversal of a judgment." *Kerr v. Killian*, 197 Ariz. 213, 216 ¶ 11 (App. 2000). For example, an "[a]ppellant can appeal from only that part of the judgment by which she is aggrieved." *Gubser*, 126 Ariz. at 306. And "[w]hen an error applies to only one party who does not appeal, another party cannot make that argument on its own behalf." *Miller v. Ariz. Corp. Comm'n*, 227 Ariz. 21, 27 ¶ 22 (App. 2011).

¶25  Standing is not a one-sided requirement. Not only must a party appealing a judgment have standing, but at least one party defending a judgment must too. As this court has explained, "'[s]tanding' focuses on the parties and requires that *each party* possess an interest in the outcome of the litigation." *Chambers v. United Farm Workers Org. Comm., AFL-CIO*, 25 Ariz. App. 104, 106 (1975) (emphasis added); *Armory Park Neighborhood Ass'n v. Episcopal Cmty. Servs. in Ariz.*, 148 Ariz. 1, 6 (1985) ("Our court of appeals has explained that these considerations require at a minimum that each party possess an interest in the outcome"). For example, we have analyzed whether an intervenor had standing to defend against a cross-appeal. *See Ayres v. Red Cloud Mills, Ltd.*, 167 Ariz. 474, 477 (App. 1990) In *Ayres*, the plaintiffs asserted an intervenor "lack[ed] standing to defend th[e] appeal" because it would not directly affect her. *Id.* We reiterated that standing "requires that each party possess an interest in the outcome of the litigation" and applied that standard to assess standing to defend an appeal. *Id.* (quoting *Chambers*, 25 Ariz. App. at 106). Because the intervenor would have been "substantially aggrieved if plaintiffs prevail[ed] in their argument," she had "standing to defend." *Id.*

¶26  Our supreme court and this court have both required standing for judicial and quasi-judicial parties who wish to defend the correctness of their decisions on appeal. In *Evertsen v. Industrial Commission*, this court considered "[t]he standing of the Industrial Commission to file

briefs before this court for unrepresented claimants[.]"  117 Ariz. 378, 379 (App. 1977).  We concluded the Industrial Commission "should only appear before this court as an advocate in those cases where it has *a legitimate interest to defend*."  *Id.* at 382 (emphasis added).  Our supreme court later adopted this court's opinion in *Evertsen* as its own.  *See Evertsen v. Indus. Comm'n*, 117 Ariz. 342, 342 (1977) ("The opinion of the Court of Appeals . . . is approved and adopted as the opinion of this court.").

¶27        In *Hurles v. Superior Court*, this court considered whether a trial judge may respond to a petition for special action, which this court characterized as "a significant threshold question of standing."  174 Ariz. 331, 331–32 (App. 1993).  We concluded that trial judges have "no personal stake—and surely no justiciable stake—in whether they are ultimately affirmed or reversed" on appeal.  *Id.* at 334.  Without standing to make "I-ruled-correctly" arguments on appeal, trial judges also lack standing to make such arguments in response to a special action petition.  *Id.*  And that is true even when the trial judge is nominally a respondent.  *Id.*

**2.**

¶28        We now turn to whether the Department has standing to make the arguments it does here.

**a.**

¶29        We first summarize the Department's arguments.  Those arguments focus on the facts in this case and why they support the board's conclusion that Williams was insubordinate.  And many of them go well beyond what the board said in denying benefits.

¶30        For example, the Department argues the Mortuary "gave Williams numerous express and implied instructions in the months leading up to her termination—all of which she refused to perform or willfully disregarded without good cause[.]"  The Department then accuses Williams of disregarding her work schedule and "not notifying [the Mortuary] directly when she was not going to work her scheduled hours."  The Department says that "Williams refused to remain within her express job duties and exerted improper influence over other employees to gain their personal information."  Williams, too, "would bully other employees" and "because of her insolence," created a hostile-work environment.  And Williams "repeatedly failed" to complete assigned tasks "in *any* of the myriad job duties" assigned to her.  The board's decision relied on few, if any, of these facts.

¶31 The Department eventually defends the actual reasons for the board's decision, but those arguments too focus only on this case. The Department asserts that "substantial evidence supports the Board's finding that the reason that Williams did not complete the full assignment was because she willfully disregarded it." The Department claims the Mortuary "clearly communicated the expectation that Williams catch up on the billing backlog, and [it] ultimately gave her two weeks to finish the assignment." The Department argues "ample evidence" showed that the Mortuary was reasonable in expecting "Williams to complete the assignment within two weeks" and that she "willfully disregarded" the Mortuary's "instruction (as was her pattern in many areas of her employment)." And the Department contends "Williams first defied and then refused to comply with" the Mortuary's "instruction to restore access to at least two of its business accounts."

**b.**

¶32 Now that the Department's arguments are on the table, we determine whether it has standing to make them. To be sure, this appeal names the Department as a party. But that does not necessarily give it a justiciable interest in defending its decision.

¶33 This is not the first time this court has analyzed whether an agency performing only an adjudicatory function may become an advocate on appeal. Much like the Department adjudicates unemployment benefits, the Industrial Commission (the "Commission") adjudicates workers' compensation claims. In the 1970's, the legislature removed the Commission "from the role of both defending against an applicant's claim as keeper of the insurance fund and being an arbiter of the validity of that claim." *Evertsen*, 117 Ariz. at 381. After the legislature did so, the Commission "truly became an impartial agency for" determining workers' compensation claims. *Id.* Despite that status, the Commission, like the Department here, argued "it has an absolute right, being an administrative agency, to defend" its decisions "whenever they come under attack in a judicial proceeding." *Id.*

¶34 We disagreed. Instead, "the defense of a hearing officer's decisions, findings and award, insofar as the Commission is concerned, lies in the reasoning of the award itself." *Id.* at 382. And the Commission had no legitimate interest in avoiding confessions of error. *Id.* at 382–83. If accepted, the Commission's "position would encourage prevailing parties to allow the Commission to carry the burden and expense of the appeal." *Id.* at 383. What is more, the Commission's appearance would "destroy[]

the impartial character of the Commission as a tribunal where justice to both claimants and carriers should be meted out on an even-handed basis." *Id.* And doing so would be problematic because "like Caesar's wife, an adjudicating tribunal must avoid even the appearance of impropriety in dealing with adverse interests appearing before it." *Id.* "This is no less true of . . . an executive body than it is of a superior court as a judicial body." *Id.*; *see also Evertsen*, 117 Ariz. at 342 (adopting our *Evertsen* opinion in full); *cf. Cortaro Water Users' Ass'n v. Steiner*, 148 Ariz. 314, 318 (1986) ("[T]he vast majority of the time the agency need not take an advocate's position in the appeal.").

¶35　　　　Our reference in *Evertsen* to a judicial body was prophetic. Fifteen years later, we analyzed whether a superior court judge has standing to object to special action relief. *See Hurles*, 174 Ariz. at 332. We identified two categories of potential responses. One, those asserting "the general validity of an underlying administrative practice, policy, or local rule," which we called "defense-of-policy" responses. *Id.* And two, those asserting "the validity of a trial judge's resolution of a particular issue in a single case," which we called "I-ruled-correctly" responses. *Id.* We concluded superior court judges have standing to file "defense-of-policy" responses but not "I-ruled-correctly" responses. *Id.* at 333–34.

¶36　　　　In reaching that decision, we acknowledged that judges "generally hope their rulings are affirmed." *Id.* at 333. Yet trial judges do not appear to defend their rulings, and this court's judges do not "seek standing to urge the supreme court to uphold" our decisions. *Id.* at 334. "Rather, at every level of the judiciary, judges are presumed to recognize that they must do the best they can, ruling by ruling, with no personal stake—and surely no *justiciable* stake—in whether they are ultimately affirmed or reversed." *Id.* And that principle "is essential to impartial adjudication." *Id.* Because the response at issue in *Hurles* argued only "that the respondent judge ruled properly on the evidence before her," the judge lacked standing. *Id.*; *see also Riley, Hoggatt & Suagee, P.C. v. English*, 177 Ariz. 10, 13–14 (1993) (applying the *Hurles* framework).

¶37　　　　Other states agree that agencies serving only an adjudicatory function prior to appeal generally lack standing to later participate when their decisions are appealed. For example, the Washington Supreme Court explained that "[q]uasi-judicial agencies, as opposed to enforcement or 'front-line' agencies, are generally not permitted to bring appeals of adverse court decisions" because allowing them "to enter proceedings as a partisan may compromise the impartiality of that body in rendering its decisions." *Kaiser Aluminum & Chem. Corp. v. Dep't of Lab. & Indus.*, 854 P.2d 611, 614

(Wash. 1993). And the Commonwealth Court of Pennsylvania said that "[n]ormally, when an agency performs only an adjudicatory function, the agency lacks standing to participate in the appeal because an independent adjudicator's only function is to decide and it has no interest in the underlying matter." *E. Stroudsburg Univ. Found. v. Off. of Open Recs.*, 995 A.2d 496, 507 (Pa. Commw. 2010).

¶38 We conclude the Department has not identified a justiciable stake here. Before this appeal, the Department's sole role was to adjudicate Williams' claim; it did not appear as a party before the tribunal or the board. As detailed, the Department argues the record had sufficient evidence for the board to conclude that Williams was insubordinate. The Department does not assert that the validity of its administrative policies or practices is at issue, and it has not identified some other justiciable interest in defending against William's individual claim. Instead, the Department contends only that the board ruled properly on the evidence—it responds only that "I-ruled-correctly."

¶39 Allowing the Department to participate in this way would allow it to do so in all unemployment benefits appeals. But doing so would "encourage prevailing parties to allow [it] to carry the burden and expense of the appeal"—which is what the Mortuary has done here. *See Evertsen*, 117 Ariz. at 383. And it would also "destroy[] the impartial character of the [Department] as a tribunal where justice to" employees and employers "should be meted out on an even-handed basis." *See id.*; *see also Hurles*, 174 Ariz. at 334.

¶40 Given the arguments the Department makes, this case demonstrates why allowing it to make all arguments would harm its impartiality. The Department's arguments go well beyond the grounds the board relied on to deny benefits—the Department accuses Williams of many other misdeeds. If we were to remand to the board for further proceedings, one could hardly blame Williams for doubting that she would get a fair shake on remand.

¶41 At bottom, the Department has no justiciable interest in whether the board correctly resolved this individual dispute between the Mortuary and Williams.

**c.**

¶42 The Department makes four primary arguments why we should allow it to step into the Mortuary's shoes. None are persuasive.

¶43        First, § 41-1993(B) says, "The department and all parties before the appeals board shall be given notice of the appeal and an opportunity to appear."  And it provides that "[t]he cost of providing the record is a taxable cost if the department prevails."  A.R.S. § 41-1993(B).  The Department argues its "opportunity to appear" allows it to make whatever arguments it desires in any appeal.  But that stretches the language too far.

¶44        Practically speaking, the Department must be a party to all unemployment appeals because when one side prevails, the Department must carry out our mandate, and we can only order it to do so if it is a party.  *See, e.g.*, *Dynometrics*, 257 Ariz. at 293 ¶ 45 (remanding "for further proceedings to determine Enriquez's eligibility for benefits and whether such benefits are chargeable against Comfort Keepers' account"). But appearing as a party is not tantamount to having standing to make whatever arguments one wants.  *See Kerr*, 197 Ariz. at 216 ¶ 11; *Miller*, 227 Ariz. at 27 ¶ 22.  And a statute merely giving an agency an opportunity to appear does not—by itself—confer standing on the agency to argue "I-ruled-correctly" in individual cases.  *See Hurles*, 174 Ariz. at 332.

¶45        Consider the Commission.  It appears in all workers' compensation appeals, and yet it lacks standing to make certain arguments on appeal.  *See Evertsen*, 117 Ariz. at 382.  The same goes for the Department.  In some appeals, the Department can appear only as a nominal party, and in others it can appear as an advocate and make a "defense-of-policy" argument when "it has a legitimate interest to defend."  *Evertsen*, 117 Ariz. at 382.   In both situations, the Department has been "given . . . an opportunity to appear," which is all § 41-1993(B) commands.  *See Int'l Bhd. of Elec. Workers, Local Union 640 v. Kayetan*, 119 Ariz. 508, 510 (App. 1978) (explaining that, although the statute at issue made the agency a party to all review proceedings, "the role of the agency-defendant in the superior court proceedings may be a passive one").

¶46        That § 41-1993(B) allows the Department to obtain a taxable cost when it prevails also does not alter the calculus.  That provision is an artifact from the days when an aggrieved party had to "take an appeal against the [D]epartment[.]"  1979 Ariz. Sess. Laws, ch. 179, § 29 (1st Reg. Sess.).  We could not locate any recent instance when a court used § 41-1993(B) to award the Department costs.  But, in any event, allowing the Department to recoup a cost when it prevails does not answer the antecedent question whether it has standing to argue "I-ruled-correctly."

¶47        Second, the Department argues it "has been appearing as a party in appeals to this Court from Appeals Board decisions under [§ 43-

1993] since 1981" and thus the legislature has acquiesced in its ability to appear. Again, we do not question the Department's ability to appear. The question we answer is different: whether the Department has standing to step into the shoes of the prevailing party in board proceedings and defend how the board resolved individual issues in individual cases. Before today, no court has addressed that question either way. So there has been nothing for the legislature to acquiesce in. *See Sw. Paint & Varnish Co. v. Ariz. Dep't of Env't Quality*, 194 Ariz. 22, 26 ¶ 21 (1999) ("We have squarely rejected the idea that silence is an expression of legislative intent.").

**¶48** Third, the Department argues that *Hurles* does not apply here because there the "respondent judge [had] no personal or justiciable stake in the proceedings." But that is a question-begging argument—the pertinent question is whether the Department has a justiciable stake in whether Williams receives benefits. The Department says it has a sufficient stake because it administers the Unemployment Insurance Trust Fund. Of course, the same could be said about the Commission—it administers the workers' compensation system—and yet this court in *Evertsen* rejected the notion that the Commission has a justiciable interest in every workers' compensation appeal. *See* 117 Ariz. at 381–83; *see also Evertsen*, 117 Ariz. at 342. Applying *Evertsen*, the Department's role in administering the Trust Fund does not, without something more, give it a justiciable stake in arguing individual issues in individual cases.

**¶49** The Department also argues it has an adequate stake because the legislative policy underlying unemployment benefits is to address the "serious menace to the health, morals and welfare" stemming from "[e]conomic insecurity due to unemployment." A.R.S. § 23-601. That policy instead cuts against the Department. When an individual suffers unemployment, she should not be deprived of benefits because, although her employer does not appear on appeal, the Department insists on arguing "I-ruled-correctly." We think the legislative policy underlying unemployment benefits is better served by requiring those who prevail in Department proceedings to defend on appeal—thereby preserving the Department's impartiality in the mine run of cases—but allowing the Department to provide a "defense-of-policy" response when appropriate. *See Sw. Lumber Mills, Inc. v. Emp. Sec. Comm'n*, 66 Ariz. 1, 5 (1947) (discussing the Employment Security Act's remedial purpose and stating "that devices of every kind to defeat it are to be frowned upon and stricken down"). On the other hand, the legislative policy is ill-served by having government lawyers parachute in for employers to argue that individual issues in individual cases do not justify benefits.

¶50        Fourth (and last), the Department warns that if we conclude it lacks standing in less than all appeals, that will negatively affect other agencies.  The Department thinks so because, in some cases, there will "be no party on the other side and no adversarial process."  The Department identifies the State Bar, the Motor Vehicle Department, and the Arizona Department of Corrections as agencies that could be impacted.

¶51        The Department's slippery-slope argument does not move us. If that argument sounds familiar, it should.  It is basically the confession of error argument the Commission made in *Evertsen*, which we rejected.  *See* 117 Ariz. at 382–83.  And, if it remains unclear by now, we again emphasize that our standing analysis would differ if the agency had some role in prior proceedings other than neutral adjudicator.  As the Washington Supreme Court explained, the analysis would be different with "enforcement or 'front-line' agencies[.]"  *Kaiser Aluminum & Chem. Corp.*, 854 P.2d at 614.  We need not stake out a standing test for those types of agencies here because the Department's role vis-à-vis Williams was solely adjudicatory.  We conclude only that the Department lacks standing to argue "I-ruled-correctly" when its only role has been adjudication and the prevailing party before the Board does not appear on appeal.  Because the Department lacks standing, we do not consider the merits arguments in its briefs in deciding Williams' appeal.

## II.

¶52        Williams argues we should strike the Department's Answering Brief because it violates the Gift Clause in the Arizona Constitution.  That clause says, "Neither the state . . . or other subdivision of the state shall ever give or loan its credit in the aid of . . . any . . . corporation[.]"  Ariz. Const. art. 9 § 7.  Williams argues the Department conferred benefits on the Mortuary in the form of free "counsel" and "legal representation."

¶53        We will not decide Williams' Gift Clause argument in the context of an unemployment benefits appeal.  *See City of Flagstaff v. Ariz. Dep't of Admin.*, 255 Ariz. 7, 14 ¶ 26 (App. 2023) ("[A] court of appeals sits as a court of review, not of first view.").  In any event, by refusing to consider the Department's arguments because it lacks standing, we have rendered moot Williams' Gift Clause argument and her request to strike the Department's answering brief.

### III.

¶54        We turn to whether Williams is entitled to benefits.

### A.

¶55        The Mortuary had notice of this appeal and an opportunity to appear. *See* A.R.S. § 41-1993(B). But the Mortuary did not file an answering brief. We must decide whether that was a confession of error. That decision turns on two considerations.

¶56        First, does the appeal raise debatable issues? We have no definitive test to identify a debatable issue. But our supreme court has found a debatable issue when there was "at least grave doubt" about a superior court's order. *See Adkins v. Adkins*, 39 Ariz. 530, 531–32 (1932). On the other hand, we have found an issue not debatable when the record "clearly" resolves the question raised. *See, e.g.*, *Air E., Inc. v. Wheatley*, 14 Ariz. App. 290, 294 (App. 1971); *Honsey v. Honsey*, 126 Ariz. 336, 337 (App. 1980).

¶57        Second, if an issue is debatable, can we still waive a confession of error? In *Evertsen*, this court said that "the confession of error rule is not absolute and can be waived in the discretion of this court." 117 Ariz. at 383. As support, we cited two prior opinions where we treated the confession of error rule as permissive, not mandatory. *Id.* (citing *Ariz. Corp. Comm'm v. Constr. Trucking Serv.*, 13 Ariz. App. 22, 24 (1970) and *Ghyselinck v. Buchanan*, 13 Ariz. App. 125, 126 (1970)). We exercised discretion to "deem such a waiver appropriate here." *Id.* Then, the Arizona Supreme Court adopted our opinion in *Evertsen* as its own. *Evertsen*, 117 Ariz. at 342. In that unconventional way, our supreme court recognized that we may waive a confession of error when an agency files briefs making arguments for which it lacks standing. Because that is the situation here, we need not address whether we may waive a confession of error in other contexts. *See Mayberry v. Stambaugh*, 2024 WL 1282653 *1 ¶ 5 (Ariz. App. Mar. 26, 2024) (Morse, J., specially concurring) (mem. decision); *Luna v. Peinado*, 2024 WL 2207309 *3 ¶ 17 (Ariz. App. May 16, 2024) (mem. decision).

¶58        Williams' appeal raises debatable issues. Although we seriously doubt the board's decision correctly considered the evidence, the record is not sufficiently clear that Williams' victory is certain. Despite the existence of debatable issues, we exercise our discretion to reach the merits because it was unclear until now that the Department cannot step in for the Mortuary on appeal.

**B.**

¶**59**        Williams argues the board erred because the Mortuary did not show she was insubordinate.  We defer to the board's factual findings unless they are arbitrary, capricious, or an abuse of discretion.  *Johnson v. Ariz. Dep't of Econ. Sec.*, 247 Ariz. 351, 355 ¶ 12 (App. 2019).  Whether an employer met its burden is a question of law.  *Weller v. Ariz. Dep't of Econ. Sec.*, 176 Ariz. 220, 223 (App. 1993).  The board's legal analysis is "not binding" and "we are free to draw our own legal conclusions" about how the law applies to the facts.  *Munguia v. Dep't of Econ. Sec.*, 159 Ariz. 157, 159 (App. 1988).

¶**60**        Being "discharged for wilful or negligent misconduct" disqualifies an individual from unemployment benefits.  A.R.S. § 23-775(2).  "Misconduct justifying an employer in terminating an employee and misconduct disqualifying an employee from benefits are two distinct concepts."  *Weller*, 176 Ariz. at 223.  Misconduct includes insubordination.  A.R.S. § 23-619.01(B)(5).  "Insubordination imports a willful disregard of . . . directions of the employer and a refusal to obey reasonable orders[.]"  *Sch. Dist. No. 8, Pinal Cnty. v. Super. Ct.*, 102 Ariz. 478, 480 (1967).

¶**61**        The Department has promulgated regulations governing misconduct.  Under those regulations, an employee is expected to follow "reasonable orders, given in a civil manner[.]"  A.A.C. R6-3-51255(A)(1).  But "[t]here is no precise rule by which to judge when a dispute with a supervisor constitutes insubordination if insolence, profanity, or threats are not involved."  A.A.C. R6-3-51255(A)(1).  The regulations list three examples of insubordination: "[r]efusal to follow reasonable and proper instructions," "[i]nsolence in actions or language, profanity, or threats toward a supervisor without due provocation," and "[r]efusal to accept assignment to suitable work."  A.A.C. R6-3-51255(A)(1)(a)–(c). The "overall consideration is whether the worker acted reasonably" under "the circumstances."  A.A.C. R6-3-51255(A)(1).

¶**62**        An employer must demonstrate it discharged an employee "for disqualifying reasons."  A.A.C. R6-3-51190(B)(2)(b).  "[M]ere allegations of misconduct are not sufficient to sustain such a charge."  A.A.C. R6-3-51190(B)(2)(c).  "When the evidence, in its entirety, is evenly balanced, or weighs in favor of the claimant, misconduct has not been established and no disqualification is in order."  A.A.C. R6-3-51190(C)(3).

¶**63**        The deputy determined Williams should receive benefits. The Mortuary challenged that determination, so it had the burden of proof.

A.A.C. R6-3-51190(B)(2)(b). On appeal, the board adopted the tribunal's conclusion that Williams was insubordinate for not completing all delinquent billing. The board also concluded Williams was insubordinate for not providing passwords. Contrary to these conclusions, the Mortuary did not meet its burden to show Williams was insubordinate.

**1.**

¶64        We start with the billing issue. It is unclear whether the Mortuary terminated Williams for insubordination relating to billing. Mr. Lamont testified she was discharged because she was "not capable of doing" the job the Mortuary "hired her to do." Likewise, Ms. Lamont thought Williams was terminated because she "really did not have the working knowledge of the system that she led us to believe she did[.]" Neither incapability nor lack of knowledge is insubordination. *See* A.R.S. § 23-619.01(B)(5); A.A.C. R6-3-51255.

¶65        But assume the Mortuary terminated Williams for insubordination. Because everyone agrees Williams tried to catch up on delinquent billing, something more is needed to demonstrate refusal, insolence, or unreasonable behavior on Williams' part. *See* A.A.C. R6-3-51255(A)(1).

¶66        The significant point of disagreement in the tribunal was the timeframe Ms. Lamont gave Williams to complete the stale billing. The tribunal found Williams insubordinate because she did not complete the billing assignment the same day it was given. But no evidence shows that Ms. Lamont directed Williams to finish in one day. Rather, Ms. Lamont directed her to "get to it today," which Williams complied with by staying overnight to catch up. No evidence showed that Ms. Lamont instructed Williams to have the backlog cleared by any date certain, which undercuts the tribunal's insubordination conclusion. *See Sch. Dist. No. 8, Pinal Cnty.*, 102 Ariz. at 480 (defining insubordination).

¶67        What is more, the record is murky about the amount of time that passed between Ms. Lamont's directive and Williams' termination. Ms. Lamont claimed two weeks spanned the two events; Williams claimed one business day passed. In the end, it is Ms. Lamont's word against Williams' word.

¶68        The tribunal thought Ms. Lamont's testimony was "corroborated by another employee witness, and [Williams] actually confirmed that she was insubordinate." But neither happened. Mr. Lamont—the Mortuary's only other witness—did not testify about any

timeframe between the directive and termination. And the tribunal's comment about Williams' confirmation was based on her admission that she did not complete the billing assignment in one day. As noted, however, Ms. Lamont's directive was to begin the assignment that day, not to complete it. Because the Mortuary did not corroborate Ms. Lamont's two-week timeframe, it did not meet its burden of proof. At best for the Mortuary, the evidence was "evenly balanced," so "misconduct [was] not . . . established[.]" A.A.C. R6-3-51190(C)(3).

**2.**

**¶69**        We finish the merits with the password issue. Again, whether the Mortuary terminated Williams for not providing passwords is unclear—the Lamonts did not testify that was the reason. Even so, Williams argues the Mortuary did not prove it requested passwords before her discharge. Ms. Lamont testified she had issues obtaining passwords from Williams "at the end of the day, when she was terminated" and that Williams was "defiant." Williams testified she "didn't know that the password thing was an issue, when [she] got fired, until afterwards [she] found out." Neither party testified that any of this happened *before* the Mortuary terminated Williams. Without such evidence, the board erred in finding insubordination. *See* A.A.C. R6-3-51190(C)(3).

**ATTORNEY FEES**

**¶70**        Williams requests her costs on appeal under A.R.S. § 12-341 and her attorney fees on appeal under A.R.S. § 12-348. The latter statute allows a fee award when a party prevails in a court proceeding to review a state agency decision. A.R.S. § 12-348(A)(2). But another subsection says that statute does not apply when the state's role "was to determine the eligibility or entitlement of an individual to a monetary benefit." A.R.S. § 12-348(H)(1). The Department argues this appeal fits that exception. Williams claims the Department no longer qualifies for that exception because "it filed an adversarial brief advocating for a particular position."

**¶71**        In support of fees, Williams cites *Cortaro Water Users' Ass'n v. Steiner*, 148 Ariz. 314 (1986). *Cortaro* addressed two exceptions in § 12-348—the monetary-benefit exception in § 12-348(H)(1) and the nominal-party exception in § 12-348(H)(4). *Cortaro* concluded the monetary-benefit exception did not apply for two reasons. First, that case involved a "governmental action which tends to limit or regulate the right to use groundwater," which did not qualify as a "monetary benefit." *Id.* at 319.

The court said the monetary-benefit exception only applies when "an applicant is seeking welfare payments or a disability pension payment." *Id.* That conclusion supports the Department's position here. And if the court had ended there, we would deny Williams fees.

¶72            But the court continued and discussed a second reason why the monetary-benefit exception did not apply—the Department of Water Resources took an active role in litigating against the prevailing party. *Id.* at 320.      The court explained that, although the Department of Water Resources merely adjudicated a private dispute at the administrative level, "due to the Department's active role in the case it lost this exemption in the subsequent proceedings." *Id.* at 319. As the court explained, "since the Department actively participated all the way up to this Court, it cannot be said that it is exempt under this provision." *Id.* at 319-20.

¶73            Here, the Department's only role at the administrative level was to determine Williams' eligibility for unemployment benefits. Had the Department merely appeared in this court as a nominal appellee, its role would have remained unchanged. But the Department assumed a different role once the case arrived here. The Department became an advocate actively defending against Williams' eligibility for benefits, even when Williams' former employer did not. Although we have concluded the Department lacks standing, that does not alter the role it played—the Department's active participation went well beyond determining Williams' eligibility and forced Williams to brief additional issues. Because the Department "actively participated" in this court, "it cannot be said that it is exempt under" § 12-348(H)(1). *Id.* at 320.

¶74            We therefore grant Williams' request for attorney fees on appeal under § 12-348(A)(2) and her costs on appeal under § 12-341, subject to compliance with Arizona Rule of Civil Appellate Procedure 21.

## CONCLUSION

¶75      We reverse the board's decision about unemployment benefits and remand to the board to determine the amount of benefits to award.  We deny as moot Williams' request to strike the Department's answering brief and the Department's motion to strike certain sections of Williams' reply brief.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:      JR